IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| 210 LUDLOW STREET CORP., | : | Case No. 10-11850-TPA |
| *Debtor* | : | Chapter 11 |
| | | |
| 210 LUDLOW STREET CORP., | : | |
| *Movant* | : | |
| | : | Related to Doc. No. 5 |
| v. | : | |
| | : | |
| WELLS FARGO BANK, N.A., | : | Hearing: August 18, 2011 at 9:30 A.M. |
| *Respondent* | : | |

*Appearances:*  Robert Blumling, Esq. for the Debtor/Movant
John M. Steidle, Esq., for Wells Fargo, Respondent

## MEMORANDUM OPINION AND ORDER

The Debtor/Movant, 210 Ludlow Street Corp., is the operator of the Holiday Inn located in Warren, Pennsylvania. The Respondent, Wells Fargo Bank, N.A., a secured creditor, holds the mortgage on the real property where the Holiday Inn is located (hereinafter "Property")[1] as well as retaining a security interest in the proceeds from sales and services provided by the hotel. This case was filed on October 8, 2010. Three days later the Debtor filed a number of "first day" motions, including an ***Emergency Motion for Order Authorizing Use of Cash Collateral*** ("Motion") at Document No. 5. The Motion alleges that the Property was valued at $1,179,000 as

---

[1] The real estate comprises a 5.03 acre site located at 210 Ludlow Street, Warren, Pa. on which a 110-guest room hotel building was erected in 1979, with renovations done in 2005. The hotel is considered to be "full service," which means that there is a food and beverage component to the operation.

1

of August 24, 2010, and therefore the Debtor proposed to pay monthly adequate protection payments of $5,993.25 to Wells Fargo for use of the cash collateral.

Responses to the Motion were filed by the United States Trustee and by Wells Fargo. The UST objected to the Motion on grounds of form because it failed to comply with the Court's requirements as to the type of relief that can be granted in a cash collateral motion. *See* Document No. 34. Wells Fargo responded to the Motion, *inter alia*, by alleging that the Property was worth substantially more than the Debtor contended, and that consequently, the proposed monthly adequate protection payment was insufficient. *See* Document No. 37.

The Court scheduled a first hearing on the Motion for October 21, 2010. At that time, upon consent of the Parties, the Court allowed the Debtor to use the cash collateral and directed the Debtor to begin making interim monthly adequate protection payments of $10,000 to Wells Fargo. The Court also issued a discovery schedule, setting an evidentiary hearing for January 24, 2011. The Debtor and Wells Fargo thereafter filed a number of joint requests to continue this evidentiary hearing, indicating that they were engaged in "productive negotiations" that could obviate the need for a hearing, if successful. As a result, the hearing was rescheduled for February 23, 2011, then May 16, 2011, and finally for July 25, 2011.

The sole issue for the Court's determination at the evidentiary hearing was the value of the Property. Both sides agreed the highest and best use of the Property was the continued operation of the hotel. The Parties each presented only one witness, in each instance an expert on the appraisal of hotels. At the start of the hearing the attorneys informed the Court that the issues were further narrowed because both of these experts agreed that, under the circumstances of the

case, the proper methodology to be used in valuing the Property was the capitalization method, with the comparable sales methodology being at best a back-up or check.[2] The experts only differed on the particular type of capitalization analysis that should be used. The Debtor's expert, James Lignelli, advocated the use of an income capitalization approach, while the Wells Fargo expert, Mark Lukens, supported the use of a discounted cash flow approach. The Court will briefly summarize the views of each of the experts[3] and then move to a discussion of its finding of value.[4]

### *Summary of Expert Testimony*

The Debtor's expert conducted his original appraisal of the Property in August 2010 and arrived at a value of $1,179,000. He testified that the income capitalization method was appropriate to use here because the Warren market area for hotels is "stable," and the discounted cash flow approach was only appropriate for use in unstable markets or with new construction. After reviewing the recent economic performance of the hotel, Lignelli arrived at his valuation figure by first estimating a 44% occupancy rate for the foreseeable future for the hotel and an average daily room rate of $97.52. This resulted in gross room revenue of $1,722,788. To this was added other, projected revenue, such as for food/beverage and telecommunications receipts. Using this data, Lignelli determined that the gross annual revenue from the hotel would be $2,368,967.

---

[2] Both sides agreed that the "third methodology" often used in appraising real property, i.e., replacement cost, was inappropriate here.

[3] In summarizing the views of the experts the Court draws from both the testimony of the experts as given at the hearing and their appraisal reports which were submitted as Exhibits without objection.

[4] The Court's jurisdiction to hear this matter under *28 U.S.C. §§157* and *1334* was not at issue. This is a core proceeding under *28 U.S.C. §157(b)(2)(A)* and *(M)*.

From this, Lignelli made deductions for various costs and expenses and arrived at net income before real estate taxes of $372,307. Lignelli explained that application of a capitalization rate to this net income figure was required in order to arrive at a fair market value for the Property. According to Lignelli the capitalization rate, or "cap rate," represented the rate of return that income producing properties are expected to achieve.

Lignelli stated that there are two components that go into the base capitalization rate. First is the financing, which can be measured through the financial terms a lender would willingly accept. In Lignelli's opinion a 6.5% rate amortized over 20 years would be expected for this component, and a loan would typically be extended at a 65% loan-to-value ratio. The second component is the rate of return that would be expected for the remaining equity portion of an investment in this type of income-producing property, which he pegged at 15%. When those two components are combined *pro rata*, it leads to a base capitalization rate of 11.06%. That figure had to be adjusted because Lignelli did not believe the current real estate tax assessment was accurate. When the adjustment was applied the final result was an overall capitalization rate of 13.81%.

To preliminarily determine value, Lignelli testified that the $372,307 net income would then be divided by the 13.81% capitalization rate, resulting in an indicated value of $2,695,000 for the Property. However, that exercise was not the final step in arriving at a value. If the hotel were to be sold, the franchisor, Holiday Inn, retains the contractual right to require a capital expenditure by the new owner to upgrade the facility, something known in the industry as a "product improvement plan" or "PIP" for short. According to Lignelli the required amount of the capital expenditure for the PIP would lower the value of the hotel property, dollar for dollar. He

4

then opined that the total cost of the PIP in this case would be $1,516,000, which, when deducted from the gross, indicated value results in a final valuation of $1,179,000.

Lignelli did an update of his appraisal a few days prior to the hearing. Based on the actual experience of the hotel since his original appraisal, Lignelli modified his calculations by increasing the assumed occupancy rate to 49% and changing the average daily rate to $98.17. There was also an increase in the anticipated food/beverage revenue and minor changes to the other revenue and expense components. The final result was a new anticipated gross revenue of $2,737,249 and an increased net income before real estate taxes of $453,330. To this was applied the capitalization rate, modified slightly down from the original appraisal to 13.62% to reflect a lower interest rate for the debt component (6% vs. 6.5% in the original), and the deduction of the same PIP. The value of the hotel property as per Lignelli's updated appraisal is $1,812,000. It appears that the large bulk of the increase is attributable to the actual occupancy rate at the hotel during the preceding year having been larger than Lignelli anticipated in his original appraisal.

The expert for Wells Fargo, Mark Lukens, conducted his original appraisal in July 2010 and arrived at a current "as is" value[5] of $3,000,000. According to Lukens, under the circumstances presented, the discounted cash flow method is the proper one to use in valuing the Property. In fact Lukens testified that he has never before seen the income capitalization method,

---

[5] Use of the phrase "'as is' value" was never explained by Lukens. Based on the context used by Lukens, and as argued by the Parties, the Court can only assume the phrase equates to the relevant, current market value.

5

which Lignelli advocated, used to value a full service hotel.[6] Lukens projected that the occupancy rate for the Property would increase from 46% in years 2010/2011 to 55% in years 2014/2015, at which point it would stabilize. He projected an average daily rate of $97.00 for years 2010/2011, rising to $115.00 by years 2014/2015. He based his projections on a review of the historical data from the Property over the previous 3 years and industry wide data from the northeastern region of the country for full-service hotels of 150 rooms or less. Lukens also made projections of other revenues and expenses for the Property.

Lukens then used these various projections to calculate a forecast of income and expenses. In doing so, his first step was to select a holding period that he believed investors would look at in making a decision as to what the Property was worth. Investor surveys indicate a range of around 7-8 years but Lukens believed 10 years was a more appropriate time frame and therefore used that figure to establish his projection period. His resulting forecast thus shows cash flow for each of the years from 2010 to 2020. As part of his process he then selected a suitable discount capitalization rate to apply to those cash flows, reflecting a rate of return that an investor would expect. For this purpose, Lukens used a discount rate of 14.5%. When he applied that rate to his projections, he arrived at a current value of $2,311,000 for the projected cash flows over the 10-year holding period. Lukens next established the residual value of the property at the end of the 10-year holding period by applying a residual capitalization rate of 12.5% to the projected 11th year cash flow, less anticipated brokerage and legal fees associated with a sale of the property. That process resulted in a residual value of $1,353,000, which, when added to the present value of cash flows

---

[6] Lukens did not provide an explanation as to why a distinction would be drawn between full service hotels and other hotels when it comes to a choice of valuation methodology. The Court, itself, is unable to perceive any readily apparent reason for such a distinction.

during the holding period and rounded off, gave Lukens a total current value figure of $3.7 million. From that, he deducted $645,000 for required capital expenditures (the PIP cost), leading to a rounded, final conclusion of $3,000,000 as the Property's value.

Like Lignelli, Lukens did an update of his appraisal shortly before the evidentiary hearing. Based on the actual performance history of the Property for the approximately one-year period since his original appraisal, he modified the appraisal in several respects. The discount capitalization rate was lowered to 13.0% and the residual capitalization rate to 11.0%. The deduction for the PIP cost was increased to $800,000. The net result was an increase, in his opinion, of the current "as is" value of the Property to $3,500,000.

## *LEGAL DISCUSSION*

Because the evaluation of property is less than an exact science, the Court is given wide latitude in determining value. *See, In re Weichey*, 405 B.R. 158, 164-65 (Bkrtcy.W.D.Pa., 2009). Thus, a bankruptcy court is not bound by valuation opinions or reports submitted by appraisers, and may form its own opinion as to the value of property in bankruptcy proceedings. *See*, *In re Patterson*, 375 B.R. 135, 144 (Bankr.E.D.Pa. 2007); *In re Development, Inc*., 36 B.R. 998, 1004 (Bkrtcy.Hawaii 1984) (court may be guided but is not bound by an appraisal); *In re Rehbein,* 49 B.R. 250, 253 (Bkrtcy.Mass. 1985) (same).

The Court may accept an appraisal in its entirety or may choose to give weight only to those portions of an appraisal that assist the Court in its determination. *See, In re Brown*, 289 B.R. 235, 238 (Bankr.M.D.Fla. 2003)."[W]hen competing appraisals are submitted, the court is

required to consider portions of each to arrive at what it believes to be a realistic market value for the property." *In re Belmont Realty Corp.*, 113 B.R. 118, 121 (Bankr.D.R.I. 1990). Heightened scrutiny is appropriate when two competent appraisals are presented by qualified appraisers stating widely divergent values. *See In re Grind Coffee & Nosh, L.L.C.*, 2010 WL 1301357 (Bankr. S.D. Miss. 2011).

Based on the above, it is clear that the Court is not required to adopt one competing appraisal or the other, but may instead form its own opinion of the property value after considering the evidence presented. As the court in *Patterson*, *supra*, stated:

> Because of the subjective nature of the appraisal process, courts are given wide latitude in determining value. "A court is not bound by values determined by appraisals but rather may form its own opinion as to the value of the subject property after consideration of the appraisers' testimony and their appraisals." *In re Karakas*, 2007 WL 1307906, at *6–7 (Bankr.N.D. N.Y. May 3, 2007) ( quoting *In re Richards*, 1999 WL 14680, at *7 (Bankr.E.D.Pa. Jan. 12, 1999)). In this case, I have considered the appraisal reports and the valuation testimony presented by the two appraisers and Debtor and conclude that the proper values lie between the numbers advocated by each.

*Patterson*, 375 B.R. at 144.

In the present case the Court found little to distinguish between the experts as far as experience and qualifications. Both have been engaged in the business of performing appraisals for many years and both have the necessary qualifications for doing so. Wells Fargo argued that the opinion of its expert should be given more weight because he deals exclusively with hotel evaluations, whereas the expert presented by the Debtor values other types of properties as well. The Court has considered that argument and rejects it. Even though Lignelli appraises other types of property as well, he does a sufficient amount of work valuing hotels that the Court has no

hesitation according to him experience at least the equal to that of Lukens. In fact, the Court believes that a more diverse workload, as opposed to a single focus, may actually make for a more convincing appraisal. Thus, the Court will not give Lukens opinion more weight than Lignelli's merely because he only appraises hotels.

With that as a starting point, the Court must consider the assumptions, rationales and explanations offered by the two experts for their opinions, integrating them with its own view as to the likely value of the Property. As a first step, the Court considers the explanations offered by the two experts as to the methodology they chose to use. The Court notes that the presentation of the Parties at the evidentiary hearing was somewhat lacking as to an explanation of the differences between the two competing approaches to the capitalization method for valuing property. A useful discussion of the two approaches was provided by the court in *In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 310 (Bankr. C.D. Ill. 2003). The court there noted that the income capitalization approach is also sometimes called the "direct capitalization method", and the discounted cash flow approach is also sometimes called the "yield capitalization method". The court went on to provide the following definition for the two methods:

> Under [the "direct capitalization method"], ..., the estimate of single year's income expectancy at a projected stabilized income level, or an annual average of several year's income expectancies, is converted into an estimate of value by dividing that figure by an overall capitalization rate.
>
> * * * * * *
>
> In contrast, in the ["yield capitalization method"], the annual cash flow and sale proceeds over a typical holding period are converted into a value estimate by discounting to present value. This method is based upon earnings projections over a longer period of time and the predicted value can vary greatly depending upon the discount rate used.

295 B.R. at 310-11.

The Court understood Lignelli's testimony to be, in effect, that the income capitalization approach was the "default method" used for a capitalization valuation, with the discount cash flow approach generally restricted to use only in cases where there is an unstable market or where new construction is involved. As he found neither of those circumstances present here, he determined that the income capitalization approach was the proper one. On the other hand, Lukens expressed puzzlement as to why the income capitalization approach was used by Lignelli, testifying that he had never before known that approach to be used in connection with the valuation of a full-service hotel.

Quite frankly, contrary to the assertion by Lukens, the Court's own experience prior to this hearing has been in keeping with Lignelli's view that income capitalization was the norm, with discounted cash flow used only in unusual circumstances. The Court did some brief research to determine if there are any reported decisions concerning the usual method of valuation used in connection with a full-service hotel. In *Windsor Hotel* itself, *supra*, the court specified that the hotel at issue was an existing 119 room full service hotel, and summarized the testimony of one of the experts in the case, a man who had analyzed over 200 hotels during the preceding 10 years, as follows:

> Mr. Gloodt testified that the most appropriate method to value income producing property is the income capitalization approach. Although Mr. Gloodt utilized both the direct capitalization method and the discounted cash flow method under this approach, he considered the former to be most widely used by buyers of hotels similar to the HOTEL.

295 B.R. at 310. *See also, e.g.*, *In re Hotel Associates, LLC*, 340 B.R. 554 (Bankr. D. S.C. 2006) (both experts used direct capitalization method to value a 186 room full service hotel); *Camino, Inc.*

*v. Wilson*, 59 F.Supp. 2d 962 (D. Neb. 1999) (court agreed with majority of experts who testified that income capitalization method was generally most accurate approach to value full service hotel).

This research compels the Court to conclude either that Lukens has deliberately overstated his case by claiming that the income capitalization method is never appropriate for valuing a full service hotel, or that he simply lacks the breadth of experience to be aware that the income capitalization method is a recognized way of valuing a full service hotel. Either way, as a result, his overall credibility is thereby weakened in the eyes of the Court.

Additionally, the Court does not find the growth assumptions made by Lukens for the hotel in the initial three year period of his analysis to be realistic. Lukens portrays this as an unstable period for the hotel[7] and projects large annual increases in positive cash flow, an increase in the occupancy rate to 55%, and a fairly significant increase in the total hotel room demand for the area served by the hotel. From that point on he has the finances for the hotel "stabilizing," with the occupancy rate remaining constant and cash flow increasing at a modest rate which appears to be pegged at, or near, an assumed level of inflation. Of course, this stabilized period starts on a relatively lofty plateau generated by the optimistic forecast for the initial "unstable" period. Lukens did not provide a convincing explanation for this optimistic forecast. He did refer to some industry wide trends for the Northeastern area of the country to provide a justification for his assumptions

---

[7] It was not satisfactorily explained why this three-year period should be considered unstable. At the time Lukens and Lignelli made their original appraisals there was apparently still some thought that the City of Warren might be constructing a convention center that would draw additional visitors to the area, and that a new Comfort Inn would be built nearby that would increase the supply of hotel rooms in the area. Both of these events could obviously introduce some uncertainty into the Warren area hotel market and might justify a conclusion of instability. However, by the time the updated appraisals were done it was fairly well recognized that neither the convention center nor the Comfort Inn were going to happen, so any previous uncertainty was removed.

but, in the Court's mind, those trends should not obscure the fact that what is being valued is a specific hotel, in a specific location – Warren, Pennsylvania. In that regard, the Court was struck by a statement contained in Lukens' own report, which was also highlighted in the closing argument of the Debtor's attorney:

> According to local officials and hotel operators, there are no new demand generators or large companies relocating to the area in the foreseeable future.

*See Wells Fargo Ex. A at 63, Ex. B at 62*. Given this undisputed fact as to the stagnant state of the Warren hotel market, the Court simply cannot accept Lukens' projections as probable.

There are other indications of market stability contained in the Lukens report. For instance, at Page 48 of his report, Lukens states:

> In terms of continued hotel demand, local demand generators such as Blair Industries, Whirley Industries, Betts Industries and various refining companies are seen as relatively stable.

This is significant because the "corporate" demand is acknowledged to be the dominant share of the hotel's overall business. *See id.* at 70 (corporate estimated to be 56-57% share of the hotel's business). Elsewhere, Lukens states that:

> Occupancy levels in the competitive market remained relatively stable between 2008 and 2010 as a result of the general stability of the underlying economy.

*Id.* at 61.

Given these various statements all pointing to the stability of the Warren market area, the Court has a hard time accepting the rationale of a three-year period of instability that underlies

the Lukens' opinion. In his closing argument, Counsel for Wells Fargo was admirably blunt in saying that the choice before the Court boiled down to whether the Warren market should be considered stable or unstable, and that only if it found the latter should the Court accept the Lukens approach to valuation. As should be apparent from the above discussion, the Court finds that the Warren hotel room market is most accurately described as stable.

Based on Counsel's invitation and because it finds Lignelli's overall testimony and opinion as to value more credible than that offered by Lukens in any event, the Court will therefore start with the Lignelli appraisal as a basis for establishing a value for the Property. However, Lignelli's appraisal is not without faults of its own. To begin with, the Court does not believe Lignelli gave a sufficient explanation for the capitalization rate he chose to use. Since the choice of capitalization rate is of such importance in determining value using the capitalization method it would certainly have been helpful to have more detail provided as to how the rate was ultimately determined.[8] If the Court had heard only the Lignelli testimony on this point it might have been inclined to reject the valuation because of an insufficient basis established for the chosen capitalization rate. However, in this case Lukens also testified and expressed the view that 14.5% was an appropriate discount capitalization rate when his initial appraisal was done, and 13.0 % when he did his update. These are sufficiently close to the original, overall rate of 13.81% and updated

---

[8] Lignelli did not satisfactorily explain how he arrived at the cap rate. It is the Court's understanding that typically, the cap rate is an area of vigorous and sometimes heated debate between experts in arriving at a value since if it increases, the value decreases, and if it decreases, the subject property's value increases. Lignelli acknowledged as much later in his testimony. However, there was no cross examination as to the thought process Lignelli employed in arriving at the cap rate. Nor did Lukens undermine to any great extent the cap rate employed by Lignelli. As such, and also for the reasons which follow, the Court can only conclude that there is no dispute in this regard and will accept that Lignelli used an appropriate cap rate under the circumstances.

rate of 13.62% employed by Lignelli that the Court views them as an independent check and therefore finds the rate appropriate.

A more significant issue with the Lignelli appraisal is the deduction for the PIP. As indicated above, Lignelli had arrived at a market value for the Property through income capitalization, and then deducted $1,516,000 from that to reflect the PIP cost. The Court has no problem with that approach, in principle, since clearly, if there is a required capital expenditure that a buyer would have to make it would lower the value of the Property. The Court's concern lies with the manner in which Lignelli calculated the PIP deduction, which seemed somewhat careless and lacking in substantiation.

Carelessness was demonstrated by Lignelli's admission that he had, in effect, factored in freight charges twice in arriving at a figure for the PIP cost. Lack of substantiation was demonstrated by the fact that Lignelli included a labor component which approximately doubled the cost value estimated by the franchisor,[9] with no real basis established for doing so. Lignelli spoke vaguely of arriving at this labor component after a conversation he had with a Mr. McGraw from the hotel management, who in turn reported that he had obtained it from someone at the franchisor named "Cormier" who purportedly executes PIP programs. The Court does not find this to be a credible basis for establishing a labor component for the PIP cost. The information related by Lignelli was hearsay and in fact double hearsay. There was no analysis or explanation provided as

---

[9] The franchisor prepared a cost estimate of approximately $765,000 for the items required by the PIP. *See Ex. 16*. Lignelli testified that he added a labor component to that figure to arrive at his final PIP cost of $1,516,000. The labor component was therefore roughly $751,000.

14

to how the overall labor figure was arrived at and for all the Court knows it was nothing but a guess. The Court thus gives very little weight to the labor component of Lignelli's opinion as to the PIP cost.

On this particular point, the Court finds that Lukens is more credible. In his updated report, he estimated a PIP cost of $801,000. He noted the lack of a labor component in the franchisor's PIP cost estimate but also noted that this estimate included some items that were not mandated by the PIP (e.g., new microwave ovens and refrigerators for al the rooms) and that typically some PIP items are subject to negotiation with the franchisor. The Court accepts that these would tend to lower the overall PIP cost that a buyer would face and thus serve to offset any labor costs that would be incurred in implementing the PIP. The Court therefore finds that a PIP cost of $800,000 represents the most likely actual PIP cost and the difference between that and the higher figure advocated by Lignelli should be added back to arrive at a final valuation.

## *CONCLUSION*

For the reasons stated above, the Court finds the current value of the Property to be $ 2,528,000. The Court will allow the Parties some time to attempt a consensual agreement on cash collateral use and adequate protection payments based on this valuation. In the event they are unable to do so a further hearing on that issue will also be scheduled.

An appropriate order follows.

### *ORDER*

*AND NOW*, this *3rd* day of *August, 2011*, upon consideration of the *Emergency Motion for Order Authorizing Use of Cash Collateral* filed by the Debtor at Document No. 5, and for the reasons stated above which form the court's findings of fact and conclusions of law, it is *ORDERED, ADJUDGED and DECREED* that,

(1)    The fair market value of the hotel property located at 210 Ludlow Street, Warren, Pa. is determined to be $2,528,000 as of this date.

(2)    *On or before August 15, 2011,* the Parties shall file a *proposed Consent Order* with the Court indicating their agreement as to an adequate protection payment and other terms for the Debtor's use of cash collateral in light of the Court's decision on the value of the Property.  Alternatively, if the Parties are unable to so agree, a *Status Report* to that effect shall be filed.

(3)    A hearing to determine the amount of adequate protection payments is set for *August 18, 2011 at 9:30 A.M.* in the Bankruptcy Courtroom, U.S. Courthouse, 17 South Park Row, Erie, PA, unless the Parties reach an agreement as to payment before August 15, 2011, in which event, the August 18, 2011 hearing will be cancelled.

_____
Thomas P. Agresti, Chief Judge
United States Bankruptcy Court